Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. We're happy to hear our argument in our first case, United States v. Agent. Mr. Proctor. Good morning, Your Honors. If I may start a little bit by just reiterating the timeline because I think everything draws and why this case is different from the majority of cases we see is because of the affliction of time. So on March 26th of 2015, Howard Donnie is arrested. Howard Donnie is arrested and believed to have been involved in I think it's three cell phone store robberies with a gun. On March 30th, that's four days later, he says to his sister Stacey, get rid of the gun. On March 31st, the day afterwards, Stacey says, I took care of it. I got rid of it. Words to that effect. The events that bring us here today are April 8th. So either nine or ten days later, depending on whether she got rid of the gun the day she was asked to do it or the day she reported it had been taken care of. So what do police know when they go to the heist? They know that where Mr. Agent lives. They have been told this by Stacey. They say they have no problems figuring out from her description and if you've actually ever been there, it's real easy to see. It's right next to a hospital. The first house next to a hospital. They know what he looks like because they have pulled from I think they say probation and parole records what he looks like. He opens the door and lets them in. He does not let them in. That's not the testimony. He opens the door and is told we need to talk to you. Come inside with us. There was no consent asked for nor none given. When three men are standing there, the testimony was two or three with guns and they say you're coming inside with us to talk. That's not consent. So no, he doesn't. They knock on the door and they create this exigency. They know and when we think about exigency, when we read the cases, it's, you know, I just saw you talking outside to my wife, MacArthur. It's, you know, I just saw you run in the door and I can hear toilets flushing. Here we have best case scenario, nine days earlier, that gun was put up in the loft of the ceiling. That's the opposite of exigency. And no court has ever found that a police decision to knock on a door is a per se exception to a warrant requirement. No court has ever found that. But the created exigency issue is largely that the King case has a significant impact on that. As I understand that, if the reason the police arrive at the door is for a constitution, is not unconstitutional in and of itself. Let me ask you, is it your position that coming to the door to confirm the location, you can see that's not unconstitutional at that point? Coming to the door to confirm, sure, they can talk to anyone they want. They can knock on the door, but, you know. So your point is, your position is at that point there's no consent and at that point there's no exigent circumstances, correct? Correct. They could have asked about a rabid fox in the neighborhood or the neighbors playing the music too loud next door. They know what he looks like. It's when they force him to go inside with them. But if there's exigent circumstances, and I understand your argument that the police being at the door, I don't think there's any case saying that. But one of the factors, even under the test you say should be applied under the Turner case, is awareness that the police are on the defendant's trail. And isn't there evidence of that in the record? I don't believe so. If you put a gun in a ceiling tile nine days ago, and the police knock on your door, you know, I'm not sure of that. Every other case we read, it's flushing stuff. It's, you know, things being moved around inside. Not answering the door when you know there's people patently in there, it's telling lies that are blatant lies. We don't have any of that here. I think if the police had just said, are you Mr. Agent? We're just confirming as part of our procedures who lives in this house. Can you tell me who else is left? There would be nothing wrong with that. Is there anything in the record that during the seizure of the house, prior to coming back with the warrant, that there was evidence obtained that was used in the issue? It wasn't all the evidence that was found after the warrant was obtained? Well, so there were photos introduced at trial where the shotguns are pretty clearly sitting on the desk next to a TV in Mr. Agent's bedroom. The shotgun shells, the police say they never saw it when they did a protective sweep. So the short answer is no, there's not, but they were sitting where you would have expected the police to see it when they walked through. Why didn't the attenuation doctrine apply here? Well, because, you know, I wrote about that at the very end of my reply brief. It's too, it's not attenuated. You know, there's a linear line that goes straight through from when the police created the situation by knocking on the door, to, you know, the biggest problem I have with this case is, and respectfully why the government misses the mark, is Mr. Agent for two and a half hours was made to sit on a sofa in his living room with armed officers present. Well, assume you're right. If the evidence that was used to convict him was obtained after they came back with the warrant, why doesn't the attenuation doctrine apply? And I understand what you're saying, Your Honor. You're presumably talking about the Segura case? Yes. Segura makes the distinction between those people were under arrest, is what they talk about. They talk about those people were under arrest. They had no possessory interest in the property anymore because they're sitting in a booking cell downstairs. Mr. Agent was not under arrest. There was no, until they found that gun, there was never any probable cause to arrest him. There was probable cause to search the premises, yes, but to arrest him, no. So the reason it doesn't apply is when you distinguish Segura, who's done, you know, putting his jumpsuit on and that sort of stuff, Mr. Agent is sitting on a sofa, denied his medication for two and a half hours, while the police get this warrant for something that happened nine or ten days ago, if that makes sense. And, you know, you start, we got sidetracked, which is probably my fault, usually is, but we were talking about King. You know, King explicitly says the resident could have answered the door and refused to allow police to enter the home. That's a 470. That was not something Mr. Agent was ever offered. Justice Alito said in that opinion, absent exigent circumstances, the threshold may not reasonably cross without a warrant. You know, when we get back to that, the touchstone of the Fourth Amendment is reasonableness. Here, what they did was not reasonable. Again, in King, they said a warrantless search is permissible when the conduct of the police before the search was reasonable. Here it wasn't. The conduct in making him sit there for two and a half hours while your buddy's off getting a warrant is not reasonable. He was given no opportunity to decline the entry. And, you know, when we get to the justifications for a HUD that the evidence might have been destroyed, nonsensical. Going to melt the gun down? You know, the government in their response talks about, well, there might have been other stuff there, but that's true in every HUD. All they had reason to believe at that time was that there might be a gun in a ceiling tile in the HUDs. Doesn't the case law say destroyed or removed? Okay, so why can't you sit at the front and back door? If you see him leave, talk to him on the street. Why can't you ask him to step outside, as they did in one of the cases, and leave him there? That's less of a concern than being held on your sofa for two and a half hours. There were many last draconian steps that could have been taken. I'm not remembering correctly that the district court found that the two and a half hours was unfortunate, but well within the heartland of similar circumstances in which people were held. I believe she set it to a case that took three hours and said, well, it's less than that. It's not under those circumstances. That's only one of the factors. You were relying on him. You mentioned it several times, so I was just asking. Right, and the case she cited, too, was someone who had to remain outside his trailer for two or three hours while the police went and got a warrant. And he was allowed to go inside several times to smoke a cigarette on one occasion, to call some of his friends on another occasion. There's no evidence here that Mr. Agent was allowed any of that. To the contrary, he was not allowed the medication. The officer testified to that. We have no way of knowing what's in those bottles. It's our procedure. They're all over there. No one pays anything. See, I guess I would go back to what my colleague mentioned to you about the Segura case. It seems to me that coming from that, we have case law that says sort of no harm, no foul. Okay, you have them sitting with them for two and a half, three hours, what have you, but they don't search during that time. So what they got during that time, they didn't get this gun during that time. They waited until they had the warrant. And I don't think I understand, then, what your argument is. You just think coming into the house and sitting here for two and a half hours is harm. Harm that makes the ultimate warrant ineffective, in which the warrant was the basis for getting the gun, right? And, you know, if we go back long before that, all the cases talk about is this regional one standard and exigent circumstances. Do they exist? Well, this might not be exigent circumstances. I give you that. But it seems to me I'm still having the problem with what constitutional right of his was violated. And I take your point about they said, look, we want to come in the house and talk to you. He didn't say, no, you can't come in. He didn't say sit out here. Now, I also take your point, but maybe none of us would do that with a police officer. Frankly, when a police officer says something to me, I say, yes, sir. So maybe he is of the same ilk. But still, they waited until they got the warrant to do the search. They did? And only two and a half hours had gone by. And in Segura, how long? 19 hours. Yeah, that was different. They said 19 hours would be. There was another case, I think, that found 20 hours was too long. Segura was different because it was overnight and the people weren't in their house anymore. They were arrested and done with the booking. So would your argument have been any different if they had said to him, you go get out of the house and we're going to sit here. You can go. If he'd been free to leave, sure. We're going to search you before you go because we don't want the gun to be on you. But you can go. You would have no argument then. Is that what you're saying? I'm saying. So it's not going into his house so much for the two and a half hours. I'm trying to figure out what's critical to your argument. If he'd been free to move around his house, maybe they'd put someone outside his bedroom door. If they'd let him take his medications, if they told him he was free to leave. Well, the medications, I think you've got an independent. People can be taking all kinds of things. I hear you, but it doesn't move me anyway. I mean, ultimately, my argument would be without any potency whatsoever if they'd done what they were supposed to. It was just to wait for the darn warrant. They didn't need to confirm he lived there. Why? It seems I have a similar, what exactly? What's the crux here? Your fundamental problem is the step that they ascertained that he lived in the house. Knocked on the door. That's really what you're objecting to. That, I submit, was a pretext. They knew he lived there. They had no problem getting a warrant based on the information Stacey Donnie had already provided. They knew he lived there. They just wanted to. Perhaps so, but they didn't. So the constitutional problem is that they knocked on the door to make sure that he lived there and he was there. I'm still, is it, that's, I'm really not trying to, I'm really not arguing. I'm trying to understand what's the nub. The constitutional problem when they cross the threshold, three armed officers with guns, and say, come inside, we need to talk to you. Without any exigent circumstances existing other than perhaps what they created. But that's not, that didn't, that's not what yielded the gun. And that's the problem. Right, but the situation from then continued seamlessly until the gun was found. There was no attenuation. There was no, they all leave and they come back. There was. There was a warrant. Well, at least there was an intervening fact, a superseding fact. It was the warrant. That's right. And what you think they did wrong was knock on the door. I don't think they had any reason to knock on the door. But that's what you think. But after knocking on the door. I'm perfectly happy acknowledging that maybe they didn't have any reason to knock on the door. It's the unconstitutionality of their knocking on the doors that I'm having problems with. And the knocking on the door, I don't think ipso facto leads to us going inside. Well, once the police, once he knew the police were out there, other people were allowed to leave. The gun could have moved with them or gone in a mattress or been disassembled and disposed of. Once the police were there, then some steps had to be taken to preserve the status quo while the evidence was obtained. Many steps short of keeping him sequestered on a sofa could have been taken. People could have been searched on their way in. You think that would have been less intrusive to search everybody else who wasn't under suspicion? Not let anybody else in the house move? I think the testimony was that anyone wanting to leave was searched. Precisely. And you're saying that instead of just sequestering him to put him on the sofa, that it would have been better to just implicate everyone in the house in the limitation of movement, subjecting to searches. You see my problem? I'm just having trouble understanding other than knocking on the door. Which there might have been options to, but so what? Right. Other than knocking on the door. Once you knock on the door, what's... So what happened when they knocked on the door, Your Honor? They knocked on the door and said, what's your name? He said, my name's Kevin H. Then they go inside. At what point is he alerted to anything when they make him come inside with them and sit down? I would have been pretty curious. I would have had some suspicion if I had participated in some activity that led to my having a gun secreted in my ceiling. It's ten days earlier, it's certainly not exigent that you have it there. I see my time's up and I'll yield. I'm sorry. Thank you. Thank you. Morning, Your Honors. Good morning. May it please the Court, my name is Derek Hines. I'm an assistant U.S. attorney in Baltimore and I represent the United States. Your Honors, I'd like to start by addressing the issue you highlighted through your questioning, and that's the attenuation doctrine here. It's not in any... The defendant can seize and it's not in dispute that there's absolutely no causal link between the recovery of the evidence seized and used at court in this case and the initial entry. Even if this court were to assume for purposes of argument the initial entry was unlawful, the defendant cannot meet his burden in establishing that there was no attenuation here and that the causal link existed. As the Supreme Court has stated in Segura and, again, in other subsequent cases, there was wholly disconnected here the evidence in this case that was used versus the initial entry, which we submit was lawful and I'm happy to talk about that as well. This doesn't strike me exactly as an attenuation case either. What about independent source? I think it's both of those items, Your Honors. Sometimes the Supreme Court is telling you... I wasn't sure that the government was pursuing that. Maybe I misread your briefs. We didn't mention independent source in there. I think it's the same concept. Really, the search warrant, that is the piece, that is the source that attenuates the seizure from the initial entry. There's no dispute that when the officers entered the house, they didn't recover any items of value. They didn't use anything from their initial entry, not even the statement from Mr. Agent in the probable cause for their search warrant. So there's absolutely nothing that was used in the search warrant from that initial entry. So there really is a disconnect. So even if we were to assume for purposes of argument that there were no exigent circumstances, the defendant can't prevail under either the attenuation doctrine or the independent source doctrine, which is essentially the same thing. I'm sorry. Sorry, Your Honor. Counsel focuses very heavily on the fact that it made no sense for the police to knock on the door to make sure that Mr. Agent lived or was there. Do you have a response to that? I do, Your Honor. I think it's prudent and reasonable for the police to go and investigate and see if, in fact, the information they have can be confirmed. They were there at the house to see whether or not Mr. Agent lived there. That's the key. The defendant frames the issue in this case that they went there for the purpose of seeing that Mr. Agent was in the house and that there was only one outcome in this case. But there were a number of outcomes that could have occurred once the police decided that in the testimony from Special Agent Dane in this case indicates that they had a public information that they believe Mr. Agent lived there. There was a record from his prior criminal conviction that he lived there. But as we know, utility records, other public source data can become outdated. So I think it was prudent that the officers went there to confirm that, in fact, Mr. Agent still lived there. He could have moved within the last week, within the last month. So that's really one outcome of four, as I see it, that Mr. Agent, in fact, answered the door. Another scenario could have been that one of Mr. Agent's family members could have answered the door. They could have said, Mr. Agent's not home. He'll be back later this evening. At which point the officers would have returned to their vehicles, waited until the search warrant was procured, and then entered the home after the search warrant was procured. Of course, we don't know that. They could have said, well, I think we'll just wait him in here. It's a really cold day. I don't know what day it was, but a day like this, we'll come in the house. It's also possible that no one would have answered the door, in which case the officers would not have entered under any reason whatsoever. I'm sorry. What is the government's position as to the basis on which it entered the house? Was it consent? Was it exigent circumstances? Exigent circumstances, Your Honor. We conceded that there was no consent at the point that he identified who he was, which confirmed that he was residing there. And describe what are those circumstances that justified entry? I think that's MacArthur factor number two. If we're talking about entry, are we talking about MacArthur or are we talking about Turner? I think it's both. But as to the exigency itself that the officers believed once they entered, I think that we are talking about MacArthur. Because MacArthur factor number two is whether the police had good reason to fear that the defendant would destroy or remove evidence before they could return with a warrant. Not really destroy, certainly. Really? I would submit to the court that he could have destroyed key evidence in this case. There's three pieces of evidence that were frankly damning at trial. It was the firearm that was recovered, the fact that the firearm was recovered from his room, so he could have removed it from his room, relocated it to somebody else's room in the house and claimed that it wasn't his, and the fingerprint that was on the lasagna box that contained the firearm in his bedroom. He could have wiped that down, wiped down the firearm. And as Mr. Proctor indicated— Destroyed. Or at least with respect to the firearm, it's not exactly destroyed. It's really— I guess you could say the pizza box is destroyed. Yeah. It's not the typical scenario where you have drugs that can be flushed down the toilet. That's correct, Your Honor. But as Judge Motz pointed out, he could have destroyed the fingerprint. He also could have removed the firearm from the house. The search occurred and the entry occurred late in the evening hours. There were a series of duplexes next to one another. He could have tossed it out of the window, and law enforcement never would have recovered that firearm. So whether it's removed or destroyed, for all intents and purposes, it's effectively destroyed. And the officers going into this entry, they knew that the nature of the offense from which Mr. Agent committed was one in which he had agreed to conceal a firearm for somebody else. So I think it's very reasonable for the officers to believe that if Mr. Agent was willing to do that for Mr. Downey, and for Stacey Downey in this case, conceal that firearm, aid and abet the concealment of that firearm that was used in the commission of a series of armed commercial robberies, then once he believed the police were looking at him, it's certainly plausible that he would take the same action to conceal or hide or destroy evidence that could be used against him. Just in terms of the legal test or the legal standard that is to be applied here, and I'm disregarding right now attenuation in an independent source, but is there any authority that the MacArthur case has ever been applied to an entry into a home context? In MacArthur itself, the police did enter the home. They entered the home with the resident. In Segura, Mr. Proctor said in an opening that they took the defendant away. That's actually not true. They detained the defendant in the lobby area of his apartment and then took him up and unlawfully entered the apartment with the defendant. Is your position that the MacArthur test applies to the entry into the home? Yes, Your Honor, it does. Do you have cases in which the destruction of the evidence concern is applied in the context of firearms, something other than drugs? No, Your Honor, not in this circuit. We could find no cases where this has been addressed, yes. In some, Your Honors, if there's no further questions, I think where we are with the attenuation doctrine, it's crystal clear that the evidence that was obtained was wholly disconnected here from any purported unlawful entry in this case. The police obtained that evidence through the independent source of that search warrant, and as a result, the defendant could not prevail, even if they could, on the exit in circumstances test. But I think when you look at the MacArthur factors here, and I'll run through those rather briefly, under MacArthur factor number one, whether the police had probable cause to search the house, that's not in dispute in this case. The defendant has an appeal that there was not probable cause. MacArthur factor number two, whether the police had good reason to fear that the evidence could be destroyed. We've talked about the DNA, where the firearm was located, the fact that it could have been removed from the house, thrown outside the house, the firearm could have been dismantled so that it was inoperable, and therefore would not have been a state crime because operability is required. There's a number of things he could have done, and given the very nature of this offense where he was concealing evidence to begin with, it was reasonable for the police to believe that under MacArthur factor number two. As to MacArthur factor number three, whether the police made reasonable efforts to mitigate the intrusion, Mr. Agent, he testified in this case about the motions hearing and at trial, and he testified that the officers were polite, those were his words, they were friendly, they allowed him to stay in the living room playing his PlayStation game, SOCOM 3, they allowed him to smoke a cigarette in there, and that he corroborated everything that the officers testified in the cases, and that's that they made an initial protective sweep and then stayed with him in the living room. As to MacArthur factor number four, the time that it took in this case was two and a half hours, and I would submit to this court that that's reasonable in a case like this. The affiant, so much of the information that was in the affidavit was learned the day of from Ms. Downing, so the affiant had to type up an affidavit, get that arranged with the court commissioner to see a duty judge in Baltimore, meet with the duty judge after the duty judge had reviewed the affidavit, execute the affidavit, and then return to the residence, and two and a half hours is not near Segura, which was 19 hours, in which the Supreme Court said that that amount of time was reasonable in a metropolitan city, and so I would submit that two and a half hours was reasonable in this case as well. The whole police activity and timeline in this case, strike me as extraordinary, it usually takes the police forever to do something, and then bring and put one officer and he isn't armed, or I don't know, it just, I feel like there's something about this case we don't know, because there are all these very unusual things that happened. And Judge Blake found the officers credible in their testimony in the case, and uniquely perhaps in this case, the agent, the defendant testified, and he corroborated what the officer said, so it's not as if he said it was in fact 12 hours or 20 hours or something like that, he corroborated all that testimony. If you, I may be the only one, but I'm not convinced MacArthur applies to an entry into a home case, and I'm not asking you to argue that point, but assume I'm right, and assume Turner is the standard we should apply to the entry into the home. It seems to me there's a lot of similarity or overlap in those factors. Does the government believe it meets the exigent requirements? We've already covered this to some extent in Turner as well. Absolutely, Your Honor. I think the same, the nature of the crime, and the evidence that could be destroyed here as well, I think meet the requirements of Turner in this case as well. I think, you know, an important consideration that this court has in determining the exigent circumstances analysis here is, I think we want to encourage our officers to continue in the trajectory of their investigation, whatever they believe is next. In this case, they thought it was prudent to make sure, to assess whether or not Mr. Agent lived at that house, so that they didn't go and search an innocent person's home. But all we really have under exigent circumstances, it seems to me, is that they, he has a gun in the house, and now he knows the officers are on his trail. Which they, you know, I guess he knows because they went to the door. I mean, is there a case where that level of conduct has created exigent circumstances where you just go into the door in the event that creates the exigency? And I realize we got the Kentucky v. King case that limits the created exigency, but I'm not aware or didn't find a case that has what I would consider this relatively low level of exigency that we see here. I think in light of Kentucky v. King and the 8-1 decision there, there have not been cases that have analyzed this under the police created exigency because it's just simply not an issue as the Supreme Court has articulated in Kentucky v. King. So with that, Your Honor, I respectfully request that this Court affirm the District Court both on the exigent circumstances doctrine issue, but also if this Court decides it need not address that issue because under the attenuation doctrine the appellant can't prevail. I'm going to keep going on this last point a little bit. Assume we didn't have independent source and we didn't have attenuation. Are you saying the police can go to the door and confirm someone lives there every time? Does that automatically create exigent circumstances in any case? Because at that point they know they're on their trail. At that point there's some evidence in the house. It seems like that's a pretty broad way of viewing exigent circumstances. I think there needs to be some additional fact as to what the exigency was. But in light of Kentucky v. King, the Supreme Court has said the police can create the exigency and knocking on the door is a permissible investigative tactic. In Kentucky v. King they then heard ruffling on the inside and believed that the evidence was being destroyed. So I think in every case it should be a case-by-case analysis. Well, here we don't have any of that. They just know it's on the inside. They just have probable cause that there's evidence there. And then they now know because they showed up that he may realize. It seems to me I don't see the limits of it. Maybe you're saying Kentucky v. King. I mean a lot of ways to go there. There's no such thing as created exigency. But that seems like we've undone a lot of long-standing law. Maybe that's what the Supreme Court did. I think Kentucky v. King does say that, but I will submit that in this case, in Mr. Agent's case, what the officers in Kentucky v. King did not have was specific facts and information about the nature of the offense that Mr. Agent had committed. Mr. Agent, in this case, had actively concealed evidence used in the commission of a series of armed commercial robberies. Based on that alone, I would submit it's reasonable for the officers to believe that he would further conceal it once the police went to the house. So would you even go so far as to say that every time the police think that a suspect might have a gun, they can knock at the door and there are exigent circumstances? I do not think so, Your Honor. I would not go that far to say that. Okay, that he might have a gun and he's committed some crimes. Assertively committed some crimes. Not necessarily with the gun. Drug crimes. I think in a case-by-case analysis, for the most part, that probably would not be a legitimate reason. I share the unease with the police-created exigency. Maybe it does exist here, but I just think this is like a slippery slope, as we lawyers love to say. I understand the court's concern, but I think there is some... But the government doesn't have to, in fact, rely on exigency here, even though it's the number one argument in your brief. That's correct, Your Honor. We can rely on the attenuation doctrine. Independent source. Independent source. Which is different than attenuation, but I'll let you go. Thank you, Your Honor. If there's no further questions... Do you have some more questions? No, thank you. Are you sure? Thank you. Thanks. I know that I ran way over in my opening, and I'm fairly sure... That was my fault, and I'm sorry. I'm fairly sure the best way to lose an oral argument is the day the session wraps up, to talk inordinately, so... Just let me accept the blame for that one, and proceed independently. My preamble to that was going to be, I feel like you asked the government all the right questions, and I certainly talked at length, so... If you have any questions, I'll be delighted to answer them. Well, so maybe you can help us with... Let's say this was just an exigency case. That was the only argument that the government had, and the only argument they made. So... And then we have this Supreme Court case. And you think just outside, inside the House is the difference? Well, you know, I agree with your colleagues that I'm not sure King's the right test. And it's not the right test because... Are you talking about MacArthur or King? Oh, I'm sorry. You're right. It's been a long day already. You know, I've cited in my brief lots of cases that say there needs to be imminent destruction of evidence for an exigency to occur. And that's why you hear toilets flushing and people rustling around. And we don't have that here. There was nothing to suggest that anything... The distinction you made with MacArthur, which I thought was really a little odd, is that it involved a temporary seizure of a defendant outside rather than inside the home. Right. Which I... Because the House is not being... You know, the home is the first among equals. And if everybody's outside, it's not being violated. That is a difference. But it's what I would say is a difference. Anyway, it's a difference. We understand that, right? In the holding itself, you read MacArthur. That's not... That doesn't seem to be dispositive with respect to the innocence or did not to me. Correct. And I'm just saying it's a factor. Yes. And I don't think there... I never... I didn't find any cases reading MacArthur that way either. Okay. You know, I cited, I believe, a panoply of cases that talk about how doing a gun in there is in there, is not itself... No, no. I did not mean that. I meant the distinction between the home and outside. The distinction that you were making. I don't think we'll find... We'll all agree that we won't find anything that's dispositive. But it's certainly a factor. So, if Your Honors have any other questions, I'll be happy to answer them. No, I think we understand very well. Thanks very much. We will come down and greet the lawyers and then go to the next case.
judges: Diana Gribbon Motz, Allyson K. Duncan, A. Marvin Quattlebaum Jr.